UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 12-CV-643 (JFB)
_____

MICHAEL A. BRANCA,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

**MEMORANDUM AND ORDER**
September 18, 2013
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Michael A. Branca ("plaintiff" or "Branca") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security ("defendant" or "Commissioner") denying plaintiff's application for disability insurance benefits. The Administrative Law Judge ("ALJ") found that plaintiff could perform his past relevant work as an insurance underwriter, and, thus, was not entitled to benefits. The Appeals Council overturned that determination, but concluded that plaintiff was nevertheless not disabled because he could perform unskilled sedentary work.

The Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the pleadings, alleging that the ALJ erred by: (1) failing to apply the treating physician rule or explain the weight given to the opinion of plaintiff's treating physicians; (2) improperly weighing his physical observations of plaintiff in determining plaintiff's residual functional capacity; (3) applying the incorrect legal standard in determining plaintiff's credibility; (4) mischaracterizing plaintiff's testimony and other evidence in the record; and (5) failing to consider evidence supporting plaintiff's testimony and the conclusions of plaintiff's treating physicians. Plaintiff also contends that the Appeals Council failed to: (1) conduct a function-by function analysis in determining that plaintiff could perform unskilled work; and (2) employ a vocational expert to determine that plaintiff could perform work that is available in the national economy.

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ erred by: (1) failing to explain the weight he assigned to the opinions of plaintiff's treating physicians and failing to properly assess the factors for determining what weight to give those opinions; (2) overlooking some of plaintiff's testimony and other evidence in the record regarding the limitations on his daily activities; (3) emphasizing plaintiff's physical appearance at the hearing in discounting plaintiff's subjective complaints of pain; (4) failing to make a credibility assessment of plaintiff before, and independently from, the residual functional capacity determination; (5) failing to consider and/or address portions of the record that were consistent with plaintiff's statements regarding the severity of his symptoms; and (6) failing to consider plaintiff's daily activities in the context of the entire record. Although the Appeals Council overturned the ALJ's decision that plaintiff could perform his past relevant work, the Appeals Council still found that plaintiff could perform sedentary work, and thus that plaintiff was not disabled. However, the case must be remanded because, given the errors by the ALJ, the Court is unable to determine whether that determination is supported by substantial evidence.[1]

---

[1] Because the Court finds that this case should be remanded for the reasons discussed herein, the Court need not determine whether the Appeals Council's failure to conduct a function-by function analysis in determining that plaintiff could perform unskilled work was legal error. Similarly, the Court need not address plaintiff's argument that the Appeals Council should have used a vocational expert.

I.  BACKGROUND

A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") as developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

1.  Plaintiff's Personal History

Plaintiff fell from scaffolding on March 12, 2008, and was treated at Winthrop University Hospital five days later for headaches, drowsiness, weakness, and lower back pain. (AR at 164–65.) Plaintiff was 32 years old. (*Id.* at 164.) Prior to this injury, plaintiff worked as a messenger, mover, phone clerk, assistant underwriter, and in building maintenance. (*Id.* at 128.) Seven years before his fall, plaintiff sustained a work-related injury to his lower back when he was lifting a heavy object, and he still experienced some pain from that injury at the time of his fall. (*Id.* at 199.) Plaintiff was working in building maintenance at the time of his injury. (*Id.* at 128.)

Plaintiff spends much of his days at home. (*Id.* at 48.) Although plaintiff occasionally drives, his father drove him to the hearing before the ALJ. (*Id.* at 49.) When plaintiff does drive, it is usually to doctors' appointments and he spends no longer than ten minutes in the car. (*Id.* at 61.) Plaintiff tries to walk around the neighborhood, but he experiences "a lot of pain," so he does not leave the house often. (*Id.* at 49.) He can only sit for 20 or 30 minutes at a time, and approximates that he can only lift ten pounds. (*Id.* at 50–51.) Plaintiff can "gingerly" climb the stairs,

kneel and squat with pain, and has trouble reaching with his left hand. (*Id.* at 141.)

At the hearing, plaintiff stated that he is able to do "minimal" household chores and that his mother does the laundry and cooking. (*Id.*) Previously, plaintiff had indicated that he could do laundry, but that he is not able do any other household chores. (*Id.* at 139.) The longest amount of sleep plaintiff gets in a night is three hours because of the "constant pain." (*Id.* at 55.) Plaintiff has trouble putting on pants, socks, and sneakers. (*Id.* at 137.) He can care for most of his other personal needs on his own, but does need reminders to take his medication. (*Id.* at 138.) His parents prepare his meals for him (*id.*), and he shops sparingly "when needed" (*id.* at 140). Most of plaintiff's time is spent watching sports and movies (*id.*), and though he still talks with family and friends on the phone, he does not socialize with them as often as he did before the accident (*id.* at 141).

Plaintiff has no trouble with his vision, hearing, or speech. (*Id.*) However, plaintiff's "mind goes in another direction" and he has trouble concentrating. (*Id.* at 142) He can follow spoken (but not written) instructions, and has no trouble "getting along" with authority figures. (*Id.*) Plaintiff has high anxiety and needs to be reminded to do things. (*Id.* at 143.)

2. Plaintiff's Medical History

a. Physical Health

Plaintiff was examined by Dr. Paul Lerner on March 24, 2008. (*Id.* at 175.) Dr. Lerner found that plaintiff was suffering from post-concussion syndrome, post-traumatic vertigo, cervical strain, lumbar radiculitis and abdominal pain, and concluded that plaintiff was totally disabled. (*Id.* at 176.) Plaintiff scored a 30/30 on a mental status exam, and 5/5 for motor strength on all tested groups. (*Id.* at 175.) Also, on March 24, 2008, Dr. John S. Boccio treated plaintiff. (*Id.* at 223.) Dr. Boccio found neck pain, pain under the rib cage, and paraspinal muscle pain, and also concluded that plaintiff was suffering from post-concussion syndrome, headaches, cervical pain, and lumbar pain. (*Id.*)

On March 25, 2008, plaintiff was treated by Dr. Bruce Ross, an orthopedist. (*Id.* at 244.) Dr. Ross diagnosed plaintiff with cervical lumbar radiculitis and requested physical therapy. (*Id.*) Plaintiff was treated by Dr. Boccio again on April 7, 2008. (*Id.* at 222.) Dr. Boccio found a decreased range of motion in plaintiff's neck, pain in plaintiff's lumbar paraspinal muscles, and 4/5 strength in plaintiff's hip muscles. (*Id.*) Plaintiff complained of "persistent headaches and dizziness," but was alert and oriented. (*Id.*) When plaintiff saw Dr. Ross on April 8, 2008, Dr. Ross again recommended physical therapy and ordered an MRI of the spine and left shoulder, as well as EMG studies of plaintiff's lower extremities. (*Id.* at 245.) Dr. Ross also stated that plaintiff was "unemployable." (*Id.*)

On April 28, 2008, plaintiff followed up with Dr. Lerner. (*Id.* at 178.) Dr. Lerner also requested an MRI of the spine and left shoulder, as well as an EMG of the lower extremities, and recommended physical therapy. (*Id.*) He concluded that plaintiff was suffering from lumbar radiculitis, cervical strain, left shoulder strain, and post-concussion syndrome, but that plaintiff's abdominal pain had improved. (*Id.*) Dr. Ross again examined plaintiff on May 1, 2008, finding that there was a limited range of motion in the left shoulder and lumbar spine. (*Id.* at 245.)

An MRI of the cervical spine was performed on May 5, 2008, which revealed

3

desiccatory changes at all the cervical discs, but no stenosis or other abnormalities. (*Id.* at 260.) Plaintiff had an MRI of his left shoulder performed on May 7, 2008. (*Id.* at 261.) Although there was no evidence of fractures, dislocations, or rotator cuff tears, there was "mild impingement of the supraspinatus muscle secondary to hypertrophic change at the acromioclavicular joint." (*Id.*) An MRI of the lumbosacral spine performed on May 8, 2008, revealed a bulging disc at L4-L5 and central herniation at L5-S1. (*Id.* at 262.)

Dr. Mathew Chacko conducted an independent neurological evaluation of plaintiff on May 26, 2008. (*Id.* at 179.) Plaintiff was alert and oriented during the examination, "exhibited a mild limitation of active range of motion of the neck in all directions," and had normal strength and tone in all extremities. (*Id.* at 180.) Although plaintiff walked with a "mild stooping gait, favoring his right" leg, there was no sign of cerebellar dysfunction, tenderness, or muscle spasm. (*Id.* at 181.) Dr. Chacko determined that there was a history of cervical and lumbar strain, as well as of post-traumatic headaches, and concluded that plaintiff had a "marked" disability. (*Id.*)

On June 3, 2008, plaintiff visited Dr. Boccio, who noted plaintiff's neck and lumbar pain, as well as decreased range of motion in plaintiff's left shoulder. (*Id.* at 218.) On June 5, 2008, Dr. Ross requested an MRI of the thoracic spine, ordered plaintiff to continue physical therapy, and noted that plaintiff was "unemployable." (*Id.* at 248.) An MRI of plaintiff's thoracic spine revealed mild disc bulges, no evidence of focal herniation, degenerative spondylosis, and slight anterior wedging of two vertebral bodies. (*Id.* at 264.) On July 7, 2008, Dr. Ross observed limited motion in the cervical spine, thoracic spine, and lumbar spine, as well as weakness in the left shoulder. (*Id.* at 249.) He found plaintiff to be "unemployable" and requested an arthroscopic acromioplasty of the left shoulder. (*Id.*)

Dr. Armand Abulecia conducted an independent orthopedic evaluation on August 13, 2008. (*Id.* at 198.) Although Dr. Abulecia observed no deformities in the cervical, thoracic, or lumbar spine, he did notice tenderness and mild limited range of motion. (*Id.* at 201.) Plaintiff was diagnosed with cervical, thoracic, and lumbar sprains, compression fractures, and left shoulder impingement. (*Id.*) Plaintiff's left shoulder arthroscopy and acromioplasty appeared to relate to plaintiff's first accident. (*Id.*) Dr. Abulecia concluded that plaintiff had a "marked partial disability." (*Id.* at 202.) Plaintiff visited Dr. Ross and Dr. Bradley Cohen (Dr. Ross' partner) from August 14, 2008 through September 24, 2008, and his condition was largely unchanged during that time. (*Id.* at 249, 355, 250, 354.) On plaintiff's visit to Dr. Boccio on August 25, 2008, Dr. Boccio recommended shoulder surgery. (*Id.* at 216.)

Plaintiff visited Dr. Jonathan Glassman (Dr. Ross' partner) on September 25, 2008, who determined that plaintiff had posttraumatic left shoulder impingement syndrome. (*Id.* at 253.) Dr. Glassman performed left shoulder arthroscopy and subacromial decompression with bursectomy and acromioplasty on plaintiff on October 24, 2008. (*Id.* at 183.) Dr. Glassman noted that there was no rotator cuff tear or labral tears, but there was "a mild to moderate degree of posterior glenohumerall synovitis." (*Id.*) On November 3, 2008, Dr. Glassman commented that plaintiff was "on a satisfactory course" following the surgical procedure. (*Id.* at 254.)

4

On November 18, 2008, Dr. Boccio noted a decreased range of motion in plaintiff's spine and neck and diagnosed plaintiff with cervical, thoratic, and lumbar pain, left shoulder pain, and depression. (*Id.* at 214.) When plaintiff again saw Dr. Boccio on December 17, 2008, plaintiff's range of motion in his neck had improved, but the pain continued and plaintiff's left shoulder's range of motion had decreased. (*Id.* at 213.) That same day plaintiff saw Dr. Ross, who diagnosed plaintiff with chronic cervical myositis, status-post left shoulder acromioplasty, and lumbar herniated disc with sciatica. (*Id.* at 255.) Plaintiff's surgical follow-up with Dr. Glassman on December 29, 2008 showed that plaintiff was healing well with only some isolated tenderness, and that his overall progress was "satisfactory." (*Id.*)

On January 16, 2009, Dr. Boccio determined that plaintiff's condition was largely unchanged. (*Id.* at 212.) Plaintiff asked Dr. Boccio for a new prescription for his pain killers because his medication was stolen from him during a trip to North Carolina. (*Id.* at 210.) Plaintiff's condition was also largely unchanged when he visited with Dr. Ross on February 4, 2009 (*id.* at 256), and his condition was "neurologically stable" on February 6, 2009, when he visited with Dr. Cohen (*Id.*).

Dr. Matthew Skolnick conducted an independent examination of plaintiff on February 27, 2009, and diagnosed plaintiff with a left shoulder sprain (status post surgery), cervical strain, and recurrent lower back pain, and concluded that he had "mild to moderate degree of causally related disability." (*Id.* at 203–07.) Dr. Skolnick also noted that "many of [plaintiff's] complaints are highly subjective in nature and out of proportion to objective findings, both as documented in the records and on examination today." (*Id.* at 207.) During the examination, Dr. Skolnick noted that plaintiff was "a depressed-appearing man" who had to use his right hand to pull himself up from a seated position, moved very slowly with his lower extremities flexed, had no visible movement in his neck or back, and had marked reaction to light touch. (*Id.* at 205.)

Following up with Dr. Ross on April 28, 2009, plaintiff complained of worsening pain in his shoulder, as well as in his cervical and lumbar spines, which Dr. Ross thought could be cervical lumbar radiculopathy. (*Id.* at 258.) On May 4, 2009 Dr. Jason Lipetz treated plaintiff's spine. (*Id.* at 233.) Plaintiff was "in some discomfort" and his pain was worse after periods of sitting or standing. (*Id.*) Although plaintiff had a passive range of motion in his hips, he was able to "toe, heel, and tandem walk." (*Id.*) Dr. Lipetz noted that the "initiation of lumbar flexion and extension is pain provoking." (*Id.*)

Plaintiff returned to Dr. Ross on July 7, 2009, because his back "gave out," causing him to fall down a flight of stairs and reinjure his cervical lumbar spine, left shoulder, and left wrist. (*Id.* at 259.) The results from this examination were not significantly different from the examinations before the fall. (*Id.*)

On July 24, 2009, plaintiff saw Dr. Samir Dutta for a consultative orthopedic examination. (*Id.* at 240.) During the exam, plaintiff was not in "acute distress"; he walked normally, had no difficulty walking on his heels and toes, squatted half-way, did not need help changing for the exam or getting on and off the exam table, and got out of his chair without difficulty. (*Id.* at 241.) Dr. Dutta diagnosed plaintiff with a history of depression, bursectomy and acromioplasty, bulging discs, and headaches. (*Id.* at 242.) He concluded that

5

plaintiff had a "mild limitation" for sitting and standing, a "mild to moderate limitation" for walking, and a "moderate limitation" for continually bending and lifting heavy weight. (*Id.*)

On March 16, 2010, Dr. Ross completed a medical source statement. (*Id.* at 365.) Dr. Ross assessed that plaintiff was "totally temporarily disabled" because of lumbar and cervical herniations and a left shoulder tear. (*Id.*) Plaintiff could only lift up to ten pounds for two-to-three hours each day, had limited standing and walking abilities, could only sit for four hours each work day, and could not climb, stoop, kneel, crouch, or crawl. (*Id.* at 365-66.) Ultimately, Dr. Ross concluded that plaintiff was "totally unemployable until further notice." (*Id.* at 367.)

Dr. Boccio also completed a medical source statement. He assessed that plaintiff could occasionally lift lighter weight, and could lift up to 10 pounds. (*Id.* at 368.) He stated that plaintiff could stand and walk less than one hour each day, and sit for up to one hour each day. (*Id.* at 368-69.) Plaintiff could not climb, balance, crouch, or crawl, but could stoop and kneel. (*Id.* at 369.) Plaintiff could not be exposed to heights, moving machinery, or noise. (*Id.* at 370.)

b. Mental Health

On May 16, 2008, Dr. Cohen commented that while plaintiff was "awake, alert and oriented," he was "slow to respond." (*Id.* at 246.) Plaintiff followed "1-step not complex commands," and only recalled "1 out of 3 objects in 2 minutes." (*Id.*) Dr. Cohen determined that plaintiff had a "mild cognitive impairment." (*Id.*) Dr. Cohen also diagnosed plaintiff with posttraumatic headaches, posttraumatic vertigo, and post-concussive syndrome. (*Id.* at 247.) He requested an MRI of the brain, an electroencephalogram, and a psychiatric evaluation. (*Id.*) Plaintiff's May 28, 2008 MRI of the brain showed "mild inflammatory changes within the paranasal sinuses," but was "otherwise normal." (*Id.* at 263.) Plaintiff later complained to Dr. Cohen that he was "not doing well" and that he believed he was depressed. (*Id.* at 245.)

Plaintiff saw Dr. Cohen again on July 24, 2008, and Dr. Cohen noted that although plaintiff was feeling better and had more energy, he was still depressed. (*Id.*) When plaintiff saw Dr. Cohen on September 29, 2008, his emotional state had improved and he was "less sleepy and less depressed." (*Id.* at 250.) Over the next several months, Dr. Cohen noted some improvement and believed that plaintiff was neurologically stable. (*See id.* at 250, 255-56.)

On January 13, 2009, Dr. Alain De La Chappelle performed an independent psychiatric examination on plaintiff. (*Id.* at 194.) As part of that examination, plaintiff reported that he saw psychiatrist Dr. Gadaleta monthly. (*Id.*) Dr. De La Chappelle noted that plaintiff "ambulates in some pain discomfort," but his thoughts were "well developed," he "evince[d] no looseness of associations," and he "relate[d] well to the examiner's questions." (*Id.* at 195.) Plaintiff's mood was "dysphoric," his memory was good, he was oriented, and his concentration was good." (*Id.* at 196.) Plaintiff was diagnosed with depressive disorder and a "moderate, partial work-related disability," but Dr. De La Chappelle said that from a psychiatric viewpoint, plaintiff could "return to work on a part-time basis with light duties to minimize stress." (*Id.*)

On July 7, 2009, after treating plaintiff for at least nine months, Dr. Gadaleta noted that plaintiff's "depression and panic attacks have continued." (*Id.* at 343.) Plaintiff was

6

still "extremely demoralized by his physical condition which does not allow him to function both vocationally or socially." (*Id.*) Dr. Gadaleta noted that plaintiff recently began taking Zoloft. (*Id.*)

Dr. Kathleen Acer conducted a psychiatric evaluation of plaintiff on July 24, 2009, and concluded that he was mildly depressed and his mood was dysthymic. (*Id.* at 236–37.) Plaintiff's gait, posture, and motor behavior were restless due to pain. (*Id.* at 237.) Plaintiff was able to concentrate and do simple calculations. (*Id.*) Dr. Acer stated that, although plaintiff could "maintain attention and concentration, at least on a short-term basis," plaintiff "may have some difficulty in performing complex tasks independently and dealing with stress." (*Id.* at 238.) Plaintiff reported that he can dress, bathe, groom himself, do laundry, shop, manage finances, and drive, but that he is physically unable to cook or clean. (*Id.*) Dr. Acer noted that, although the evaluation's results were consistent with psychiatric problems, "this does not appear to be significant enough to interfere with functioning." (*Id.*)

Dr. Gadaleta completed a medical source statement on April 1, 2009, stating that plaintiff could follow work rules, maintain his concentration and attention, relate to coworkers, use judgment, and interact with supervisors. (*Id.* at 371.) Plaintiff could understand, remember, and carry out job instructions. (*Id.* at 372.) However, plaintiff would not deal well with the public, work stress, or working independently. (*Id.*) Plaintiff's concentration was also impaired due to depression and anxiety. (*Id.*) He would be unable to — or would be poorly able to — maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (*Id.* at 372.) Overall, Dr. Gadaleta concluded that plaintiff's "depression limits [his] level of functioning." (*Id.* at 371.)

### 3. The Administrative Hearing

At the April 7, 2010 hearing in front of the ALJ, plaintiff was questioned by both the ALJ and his attorney. Plaintiff primarily testified regarding his pain and his life activities. Specifically, plaintiff stated that he is in "pain a lot, and the pain radiates down my legs and into my feet . . . . I deal with a lot of pain every day, it's 24/7, 365." (*Id.* at 48.) Plaintiff said he is able to sit for "20 minutes to a half hour" and that he is "up down, up down." (*Id.* at 50.) Approximately half way through the hearing, the ALJ commented to the plaintiff: "You seem to be sitting okay." (*Id.* at 51.) Plaintiff responded, "Yeah, I'm in a lot of pain, though." (*Id.*)

Plaintiff commented that he is "lucky enough to have the parents to live at home, or else [he would be] be out on the street." (*Id.* at 48.) Plaintiff stated that he only drives "occasionally" and that his father drove him to the hearing. (*Id.* at 49.) Plaintiff said that his mother does the laundry and cooks. (*Id.* at 53.)

Notably, for reasons discussed in detail *infra*, the hearing began at 9:13 a.m. and concluded at 9:42 a.m.

### 4. Administrative Proceedings

On April 3, 2009, plaintiff applied for disability insurance benefits, alleging disability since March 13, 2008. (*Id.* at 123.) Plaintiff's application was denied on April 23, 2010. (*Id.* at 20–30.) The ALJ determined that plaintiff was not disabled under the Social Security Act. The ALJ concluded that plaintiff had the following severe impairments: small protrusion to the left at L5-S1, mild multilevel spondylosis in

7

the cervical spine, multilevel mid-thoracic spondylosis in the thoracic spine, status post left shoulder arthroscopy and subacromial decompression with bursectomy and acromioplasty for left shoulder impingement syndrome, depression, and anxiety. (*Id.* at 22.) However, the ALJ concluded that plaintiff had the residual functional capacity to perform "the full range of sedentary work" (*id.* at 25), and "is capable of performing [his] past relevant work as an insurance underwriter" (*id.* at 30). In short, the ALJ believed that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" and that the diagnoses of plaintiff's treating physicians (Dr. Ross and Dr. Boccio) were not supported by "the objective evidence and the appearance of the claimant at the hearing." (*Id.* at 27-28.) The ALJ also believed that the psychological assessment of Dr. Gadaleta (plaintiff's treating psychiatrist) "is not supported by clinical findings and is inconsistent with other substantial evidence in the record." (*Id.* at 29.)

The Appeals Council overturned the ALJ's conclusion regarding plaintiff's ability to perform his past relevant work, holding that "[b]ecause the claimant was limited to simple instructions, he is unable to perform his past relevant work as an insurance underwriter." (*Id.* at 10.) However, the Appeals Council still concluded that plaintiff was not disabled because he could be employed in "unskilled sedentary occupations." (*Id.*) Thus, plaintiff was not entitled to receive benefits. (*Id.* at 12.)

B. Procedural History

Plaintiff commenced this action on February 9, 2012, appealing the Appeals Council's December 20, 2011 decision finding that plaintiff was not disabled due to his ability to perform a significant number of jobs in the national economy. The Commissioner answered on June 5, 2012, and filed the pending motion for judgment on the pleadings on July 9, 2012. Plaintiff also filed a motion for a judgment on the pleadings on July 9, 2012. Plaintiff replied on July 10, 2012, and the Commissioner also filed a reply on August 8, 2012. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is "based upon legal error" or "not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted); *see also Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

8

## III. DISCUSSION

### A. Disability Determination

#### 1. Legal Standard

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

#### 2. Analysis

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and is the result of legal error. As set forth below, this Court concludes that this case should be remanded to the Commissioner because the ALJ erred by: (1) failing to explain the weight he assigned to the opinions of plaintiff's treating physicians and failing to properly assess the factors for determining what weight to give those opinions; (2) overlooking some of plaintiff's testimony and other evidence in the record regarding the limitations on his daily activities; (3) emphasizing plaintiff's

9

physical appearance at the hearing in discounting plaintiff's subjective complaints of pain; (4) failing to make a credibility assessment of plaintiff before, and independently from, the residual functional capacity determination; (5) failing to consider and/or address portions of the record that were consistent with plaintiff's statements regarding the severity of his symptoms; and (6) failing to consider plaintiff's daily activities in the context of the entire record.

### a. ALJ's Decision

#### i. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial work activity is work activity that involves doing significant physical or mental activities, *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity. In this case, the ALJ determined that plaintiff had not engaged in any substantial gainful activity since the alleged onset date of March 13, 2008. (AR at 22.) Substantial evidence supports this finding and plaintiff does not challenge its correctness.

#### ii. Severe Impairment

If the claimant is not employed, the ALJ then determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46. The ALJ in this case found that plaintiff had severe impairments of small protrusion to the left at L5-S1, mild multilevel spondylosis in the cervical spine, multilevel mid-thoracic spondylosis in the thoracic spine, status post left shoulder arthroscopy and subacromial decompression with bursectomy and acromioplasty for left shoulder impingement syndrome, depression, and anxiety. (AR at 22.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

#### iii. Listed Impairment

If the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). In this case, the ALJ found that plaintiff's impairments did not meet any of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 24.) Substantial evidence supports this finding and plaintiff does not challenge its correctness.

#### iv. Residual Functional Capacity

In this case, the ALJ found that plaintiff had the residual functional capacity to perform "the full range of sedentary work" (*id.* at 25), and "is capable of performing [his] past relevant work as an insurance underwriter" (*id.* at 30). The ALJ performed a lengthy recitation of the medical evidence. The ALJ believed that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" and that the diagnoses of plaintiff's treating physicians (Dr. Ross and Dr. Boccio) were not supported by "the objective evidence and the appearance of the claimant at the hearing."

(*Id.* at 27-28.) The ALJ also rejected Dr. Gadaleta's finding that plaintiff "has poor or no ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability" because this assessment was "not supported by clinical findings and is inconsistent with other substantial evidence in the record." (*Id.* at 28-29.) The ALJ concluded that his residual functional capacity assessment "is supported by the limited findings on several examinations and MRIs . . . the claimant's acknowledged activities[,] the claimant's improvement following left shoulder surgery[,] the claimant's symptom magnification during examination and his very vague complaints at [the] hearing which undermine his credibility." (*Id.* at 29.) The ALJ also stated that he gave "substantial weight" to the opinions of Dr. Glassman, Dr. Lipetz, Dr. Felt, Dr. Dutta, Dr. Skolnick, Dr. De La Chappelle, and Dr. Acer. (*Id.*) However, he did not state what weight he gave to the opinions of Dr. Ross, Dr. Boccio, and Dr. Gadaleta.

As stated *supra*, the Appeals Council overturned the ALJ's determination. The Appeals Council did not find that the ALJ erred in not crediting the opinions of plaintiff's treating physicians, or that the ALJ did not adequately account for plaintiff's subjective complaints of pain, but instead concluded that the ALJ incorrectly determined plaintiff could perform his past relevant work because plaintiff "was limited to simple instructions." (*Id.* at 10.) Although the Appeals Council overturned the ALJ's determination regarding plaintiff's ability to perform his past relevant work, it still concluded that plaintiff could perform sedentary work.

For the reasons set forth *infra*, the Court finds that there were legal errors in connection with the Commissioner's assessment of plaintiff's ability to perform unskilled sedentary work, and, in light of those errors, a remand is necessary because the Court cannot determine whether substantial evidences support the decision. *See, e.g.*, *Armstead v. Chater*, 892 F.Supp. 69, 76 (E.D.N.Y. 1995) ("[T]he Court is left to speculate whether all the circumstances of the petitioner's claim were thoroughly analyzed, or instead were overlooked. Consequently, the Court is unable to find that the Commissioner's determination is supported by substantial evidence, and in this posture, a remand of this case to the Commissioner is appropriate." (internal citation omitted)).

v. Other Work

At step five, if the claimant is unable to perform his past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id.* § 404.1560(c); *see also Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998).

In this case, the Appeals Council considered plaintiff's age, education, work experience, and residual functional capacity, and found that there were 200 occupations, each representing numerous jobs in the national economy, that plaintiff could perform. (AR at 10.)

b. Treating Physician Rule

i. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at

11

118. The "treating physical rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Furthermore, although treating physicians may share their opinion concerning a patient's inability to work and the severity of disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. *See Clark*, 143 F.3d at 118; 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in [his] notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." 20 C.F.R § 404.1527(c)(2); *see also*, *Perez v. Astrue*, No. 07-CV-958, 2009 WL 2496585, at *8 (E.D.N.Y Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (citation and internal quotation marks omitted)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133.

12

### ii. Analysis

There was a legal error in the ALJ's decision because he failed to apply the proper standard for evaluating the medical evidence of a claimant's treating physicians. The ALJ did not note the weight that he assigned to the opinions of Dr. Ross, Dr. Boccio, and Dr. Gadaleta, plaintiff's three treating physicians with opinions favorable to him. Although the ALJ listed the evidence that contradicted the findings of these doctors, the ALJ's failure to list the weight assigned to those opinions was error because it prevents this Court from determining whether the ALJ's decision was supported by substantial evidence. *See, e.g.*, *Taylor v. Barnhart*, 117 F. App'x 139, 140-41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (citation and internal quotation marks omitted)); *Featherly v. Astrue*, 793 F. Supp. 2d 627, 632 (W.D.N.Y. 2011) (remanding case when ALJ's opinion contained only a "cursory discussion" of the reasons for assigning certain weight to two of plaintiff's treating physicians and failed to mention the weight assigned to the opinions of other treating physicians).

Even if the Court assumes that the ALJ rejected the opinions of these physicians and assigned them no weight, there was additional legal error in that the ALJ's decision failed to consider the five factors to determine how much weight to give these opinions. "Even when an ALJ does not give controlling weight to a treating physician's opinion, the ALJ cannot give the opinion *no* weight without making certain findings." *Daniel v. Astrue*, No. 10-CV-5397, 2012 WL 3537019, at *9 (E.D.N.Y. Aug. 14, 2012). Although the ALJ listed how the opinions of the treating physicians were contradicted by the other evidence in the record, he never discussed the length of the treatment relationship plaintiff had with these doctors and the evidence in the record that *supported* the findings of these physicians.[2] This failure is grounds for remand. *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 431 (S.D.N.Y. 2010) (Report and Recommendation) (remanding to the Commissioner because "the ALJ never followed the analytical path mandated by regulation, which requires that he discuss the length of treating relationship, the expertise of the treating doctors, the consistency of their findings and the extent to which the record offers support for some or all of those findings").[3]

### c. Plaintiff's Testimony

The case must also be remanded to the Commissioner because there were errors in the ALJ's assessment of plaintiff's testimony.

First, the ALJ stated that "at the hearing, the claimant testified that he drives, walks for exercise, and paces the floor while he watches TV." (AR at 27.) The ALJ also noted that plaintiff reported to Dr. Acer that

---

[2] For example, the ALJ failed to discuss the repeated evidence in the record of plaintiff's discomfort, which would support the findings of the treating physicians. (*See, e.g.*, AR at 222 (Dr. Boccio noting decreased range of motion in plaintiff's neck); *id.* at 249 (Dr. Ross finding limited motion in the cervical spine, thoracic spine, and lumbar spine); *id.* at 203-05 (Dr. Skolnick observing that plaintiff had difficulty getting out of his seat and had no visible movement in the neck and back).)

[3] The Court notes that the ALJ did give substantial weight to the opinion of Dr. Glassman, plaintiff's treating surgeon. However, Dr. Glassman's notes concern plaintiff's recovery from his shoulder operation, and Dr. Glassman did not assess plaintiff's ability to sit and stand.

he is "able to do laundry, shop, manage finances, and drive" (*id.*), and reported to Dr. Dutta that he "does the laundry, shops, showers, and dresses herself [sic]" (*id.* at 28). However, in making this finding, the ALJ appears to have overlooked or misconstrued plaintiff's testimony. Notably, at the hearing, plaintiff stated that he only "occasionally" drives and that his father drove him to the hearing. (*Id.* at 49.) Plaintiff also stated that he does walk around the neighborhood for exercise, but that he does not "get too far." (*Id.*) He explicitly stated that his mom does the laundry and the cooking. (*Id.* at 50.) In addition, although Dr. Dutta did note that plaintiff reported he is able to do the laundry, shop, and drive, the ALJ omitted that plaintiff reported to the doctor that he is physically unable to cook or clean. (*Id.* at 238.)

Although the ALJ may choose what weight to give to plaintiff's testimony and other evidence in the record, this failure to consider certain testimony, or misconstruing such testimony, warrants a remand in this case. *See, e.g., Correale-Englehart*, 687 F. Supp. 2d at 436 (stating that ALJ's decision was not supported by substantial evidence because, *inter alia*, the ALJ "misstated plaintiff's testimony" and "ignored" some of her testimony); *Edel v. Astrue*, No. 06-CV-440, 2009 WL 890667, at *17 (N.D.N.Y. Mar. 30, 2009) ("Because the ALJ did not properly complete the credibility analysis and his determination relied on an erroneous recitation of the facts, the Court recommends that the case be remanded to the ALJ for further analysis . . . ."); *Aragon-Lemus v. Barnhard*, 280 F. Supp. 2d 62, 70 (W.D.N.Y. Aug. 7, 2003) (remanding action when the "ALJ mischaracterize[d] plaintiff's testimony and much of the evidence cited is irrelevant or unsubstantiated"); *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (per curiam) (remanding case because, *inter alia*, "the ALJ repeatedly mischaracterized the record in identifying purported 'inconsistencies' in [plaintiff's] testimony").

Second, the ALJ improperly emphasized plaintiff's physical appearance at the hearing, stating on two separate occasions that plaintiff's appearance belied his complaints of pain. (*See* AR at 27 ("In terms of the claimant's allegation that he is in constant pain, at the hearing he was sitting comfortably."); *id.* at 28 ("I find that the objective evidence and appearance of the claimant at the hearing do not support the residual functional capacity opinions of Dr. Ross and Dr. Boccio.").) In addition, approximately half way through the hearing, the ALJ commented to the plaintiff: "You seem to be sitting okay." (*Id.* at 51.) Plaintiff responded, "Yeah, I'm in a lot of pain, though." (*Id.*)

The regulations do allow "observations by our employees and other persons" to be treated as evidence. 20 C.F.R. § 416.929(c)(3). Although the Second Circuit has held that "there is no *per se* legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility" "such observations should be assigned only limited weight." *Schaal*, 134 F.3d at 502 (internal quotation marks omitted). The "sit and squirm index," as this technique is known, has been heavily criticized within the Circuit. *See Aubeuf v. Schweiker*, 649 F.2d 107, 113 (2d Cir. 1981) (stating that subjecting claimants to a "sit and squirm index" "raises serious questions" and noting that rendering an expert medical opinion is "beyond [the] competence" of an ALJ); *De Jesus v. Sec'y of HHS*, No. 83 CV 1107, 1984 WL 62838, at *2 (E.D.N.Y. May 23, 1984) ("The ALJ appears to have based his decision substantially upon his observation of plaintiff at the hearing. This practice, described as reliance upon a 'sit and squirm' index, has been disapproved in

this Circuit and others for quite some time."); *see also Tyler v. Weinberger*, 409 F. Supp. 776, 789 (E.D. Va. 1976) ("Clearly, a 'sit and squirm' index, . . . applied by a Judge who is not a medical expert will not only result in unreliable conclusions when observing claimants with honest intentions, but may encourage claimants to manufacture convincing observable manifestations of pain or, worse yet, discourage them from exercising their right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel.").

In this case, the ALJ improperly overemphasized personal observations of plaintiff's appearance in concluding that plaintiff was not disabled and was exaggerating his symptoms. Although the ALJ did not state what weight he gave to these observations, by prominently mentioning on two separate occasions that plaintiff's complaints were not consistent with his observations, as well as by commenting at the hearing that plaintiff "seem[ed] to be sitting okay," the Court is very concerned that the ALJ did not give his observations the "limited" weight allowed under Second Circuit case law. *See Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174, 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) (remanding case and stating that "[o]ne such [legal] error was the ALJ's apparent overreliance on his observations of [plaintiff's] condition during the hearing").

In addition, the Court notes that it is unclear whether such observations had any probative value in light of the testimony and evidence in this case. More specifically, the record indicates that plaintiff can sit for approximately 30 minutes before he needs to walk around. (*See* AR at 50.) However, the hearing in this case lasted less than 30 minutes and the ALJ commented that plaintiff appeared to be sitting without difficulty approximately half way through the hearing. Therefore, the ALJ found plaintiff's complaints not credible even though nothing in the record indicates that plaintiff would not have been able to sit through a short hearing. Accordingly, in this particular case, even if plaintiff did not appear to be in discomfort during the hearing, that fact was not inconsistent with the other evidence in the record given the short duration of the hearing. *See Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (reversing the ALJ's determination and stating that "the ALJ's observation that [plaintiff] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight, and since only a 40-minute period was involved it is not inconsistent with the medical evidence and [plaintiff's] own testimony" (internal citation omitted)).

### d. Residual Functional Capacity Assessment

In determining plaintiff's residual functional capacity, the ALJ made three additional errors. First, the ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR at 27.) As the Seventh Circuit has noted, this "gets things backwards" because "the passage implies that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "The requirements of 20 C.F.R. § 404.1529(c)(4) provide that the ALJ must make a credibility assessment before making a RFC assessment, because the credibility assessment is used to determine [p]laintiff's limitations and RFC." *Faherty v. Astrue*, No. 11-CV-2476, 2013 WL 1290953, at *16 (E.D.N.Y. Mar. 28, 2013). "Therefore, the

ALJ cannot claim that [p]laintiff's testimony is not credible because it is inconsistent with the RFC, when that testimony, in part, should be used to determine the RFC. On remand, the ALJ should determine [p]laintiff's credibility before, and independently from, the RFC determination." *Id.*; *see also Pinson v. Colvin*, No. 12-C-395, 2013 WL 4647795, at *8 (E.D. Wisc. Aug. 29, 2013).[4]

Second, the ALJ failed to consider all of the relevant factors in determining plaintiff's credibility. In short, the ALJ did not believe plaintiff's statements regarding the severity of his symptoms. However, the regulations specifically acknowledge that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone . . . ." 20 C.F.R. § 404.1529(c)(3). Although there are numerous factors that an ALJ must consider in assessing credibility, "[o]ne strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record." *F.S. v. Astrue*, No. 10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012). In this case, the ALJ cited all of the medical evidence that did not support a finding of disability, but failed to consider plaintiff's prior statements or actions which bolstered his credibility. (*See, e.g.*, AR at 216 (Dr. Boccio noting that plaintiff had to lean on a table during an appointment because he could not stand up due to pain).)

Third, the ALJ appeared to place great emphasis on plaintiff's daily activities. As a threshold matter, as noted *supra*, the Court finds that the ALJ appears to have misconstrued plaintiff's abilities to perform daily activities. However, even if the ALJ correctly considered and understood plaintiff's testimony on that issue, the daily activities cannot be considered in isolation. In particular, the regulations provide that the ALJ should consider daily activities when assessing a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1529(c)(3)(i). However, "[i]t is well-settled law in this Circuit that such activity does not, in itself, contradict a claim of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Brown*, 2011 WL 1004696, at *5 (citation and internal quotation marks omitted). Plaintiff's ability to feed and bathe himself, as well as sit or drive for short periods of time, are not necessarily inconsistent with his alleged difficulty of sitting for greater than 30 minutes at a time and the assessment of his treating physicians that he cannot sit or stand through an eight-hour work day. *See id.* (stating that it was legal error to assign "excessive weight" to basic daily activities); *see also Bjornson*, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) ("The fact that [plaintiff] tries to maintain her home and does her best to engage in ordinary life activities is not inconsistent with her complaints of pain, and in no way directs a finding that she is able to engage in light work."); *Balsamo v. Chater*,

---

[4] As the Seventh Circuit has acknowledged, inclusion of this "boilerplate" language alone does not require remand "[i]f the ALJ has otherwise explained his conclusion adequately." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). However, for the reasons discussed *infra*, the ALJ made other errors in assessing plaintiff's residual functional capacity, and, thus, remand is warranted.

16

142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act."); *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995) ("[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."); *Faherty*, 2013 WL 1290953, at *16 ("[T]he ALJ failed to consider that Plaintiff's ability to engage in certain daily activities does not necessarily mean she lacks credibility as to the severity of her symptoms. Her ability to drive occasionally and take her children to school or perform mundane tasks of life do not necessarily indicate that [she] is able to perform a full day of sedentary work." (alteration, citation, and internal quotation marks omitted)). Accordingly, on remand, the ALJ should consider the daily activities in light of the other evidence in the record.

IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date:   September 18, 2013
        Central Islip, NY

\* \* \*

Plaintiff is represented Howard D. Olinsky, Olinsky & Shurtliff, 300 South State St, Syracuse, NY 13202. Defendant is represented by Loretta E. Lynch, United States Attorney, Eastern District of New York, by Kenneth M. Abell**,** 271 Cadman Plaza East, Brooklyn, NY 11201.